**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DAVID H. PICKUP; CHRISTOPHER H. ROSICK; JOSEPH NICOLOSI; ROBERT VAZZO; NATIONAL ASSOCIATION FOR RESEARCH AND THERAPY OF HOMOSEXUALITY, a Utah non-profit organization; AMERICAN ASSOCIATION OF CHRISTIAN COUNSELORS, a Virginia non-profit association; JACK DOE 1, Parent of John Doe 1; JANE DOE 1, Parent of John Doe 1; JOHN DOE 1, a minor, guardian ad litem Jane Doe, guardian ad litem Jack Doe; JACK DOE 2, Parent of John Doe 2; JANE DOE 2, Parent of John Doe 2; JOHN DOE 2, a minor, guardian ad litem Jack Doe, guardian ad litem Jane Doe, *Plaintiffs-Appellants*, | No. 12-17681<br><br>D.C. No. 2:12-CV-02497-KJM-EFB |

v.

EDMUND G. BROWN, JR., Governor of the State of California, in his official capacity; ANNA M. CABALLERO, Secretary of the California State and Consumer Services Agency, in her official capacity; SHARON LEVINE, President of the Medical Board of California, in her official capacity; KIM

MADSEN, Executive Officer of the
California Board of Behavioral
Sciences, in her official capacity;
MICHAEL ERICKSON, President of the
California Board of Psychology, in
his official capacity,
              *Defendants-Appellees*,


              and


EQUALITY CALIFORNIA,
       *Intervenor-Defendant-Appellee*.


Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, District Judge, Presiding


DONALD WELCH; ANTHONY DUK;                No. 13-15023
AARON BITZER,
              *Plaintiffs-Appellees*,          D.C. No.
                                          2:12-CV-02484-
              v.                              WBS-KJN


EDMUND G. BROWN, JR., Governor
of the State of California, in his             OPINION
official capacity; ANNA M.
CABALLERO, Secretary of California
State and Consumer Services
Agency, in her official capacity;
DENISE BROWN, Case Manager,
Director of Consumer Affairs, in her
official capacity; CHRISTINE

WIETLISBACH, PATRICIA LOCK-DAWSON, SAMARA ASHLEY, HARRY DOUGLAS, JULIA JOHNSON, SARITA KOHLI, RENEE LONNER, KAREN PINES, CHRISTINA WONG, in their official capacities as members of the California Board of Behavioral Sciences; SHARON LEVINE, MICHAEL BISHOP, SILVIA DIEGO, DEV GNANADEV, REGINALD LOW, DENISE PINES, JANET SALOMONSON, GERRIE SCHIPSKE, DAVID SERRANO SEWELL, BARBARA YAROSLAVSKY, in their official capacities as members of the Medical Board of California,
*Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, Senior District Judge, Presiding

Argued and Submitted
April 17, 2013—San Francisco, California

Filed August 29, 2013

Before: Alex Kozinski, Chief Judge, and Susan P. Graber, and Morgan Christen, Circuit Judges.

Opinion by Judge Graber

# SUMMARY[*]

## Civil Rights

Reversing an order granting preliminary injunctive relief in *Welch v. Brown*, 13-15023, and affirming the denial of preliminary injunctive relief in *Pickup v. Brown*, 12-17681, the panel held that California Senate Bill 1172, which bans state-licensed mental health providers from engaging in "sexual orientation change efforts" with patients under 18 years of age, does not violate the free speech rights of practitioners or minor patients, is neither vague nor overbroad, and does not violate parents' fundamental rights.

The panel held that Senate Bill 1172 regulates professional conduct, not speech and therefore was subject only to a rational basis review. The panel held that under its police power, California has authority to prohibit licensed mental health providers from administering therapies that the legislature has deemed harmful, and the fact that speech may be used to carry out those therapies does not turn the prohibitions of conduct into prohibitions of speech. The panel further concluded that the First Amendment does not prevent a state from regulating treatment even when that treatment is performed through speech alone. The panel concluded that the record demonstrated that the legislature acted rationally when it decided to protect the well-being of minors by prohibiting mental health providers from using "sexual orientation change efforts" on persons under 18.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel further held that: (1) SB 1172 did not implicate the right to freedom of association because freedom of association does not encompass the therapist-client relationship; (2) SB 1172 was neither void for vagueness nor overbroad because the text of SB 1172 was clear to a reasonable person and any incidental effect that the ban had on speech was small in comparison to its legitimate sweep; and (3) the ban did not infringe on the fundamental rights of parents because parents do not have the right to choose a specific type of provider for a specific medical or mental health treatment that the state has reasonably deemed harmful.

## COUNSEL

No. 12-17681

Mathew D. Staver (argued) and Anita L. Staver, Liberty Counsel, Maitland, Florida; Mary E. McAlister, Stephen M. Crampton, and Daniel J. Schmid, Liberty Counsel, Lynchburg, Virginia, for Plaintiffs-Appellants David H. Pickup et al.

Alexandra Robert Gordon (argued), Deputy Attorney General, Kamala D. Harris, Attorney General of California, Douglas J. Woods, Senior Assistant Attorney General, Tamar Pachter, Supervising Deputy Attorney General, and Daniel J. Powell and Rei R. Onishi, Deputy Attorneys General, San Francisco, California, for Defendants-Appellees Edmund G. Brown, Jr., et al.

Shannon P. Minter (argued), National Center for Lesbian Rights, San Francisco, California; David C. Dinielli, Munger, Tolles & Olson LLP, Los Angeles, California, for Intervenor/Defendant-Appellee.

Robert P. Taylor, Arnold & Porter LLP, San Francisco, California, for Amici Curiae American Association for Marriage and Family Therapy-California Division, et al.; Elizabeth O. Gill, ACLU Foundation of Northern California, Inc., San Francisco, California, for Amicus Curiae American Civil Liberties Union Foundation of Northern California; Eric Alan Isaacson, San Diego, California, and Stacey M. Kaplan, San Francisco, California, for Amici Curiae California Faith for Equality, et al.; Brad W. Seiling, Benjamin G. Shatz, and Justin Jones Rodriquez, Manatt, Phelps & Phillips, LLP, Los Angeles, California, and Hayley Gorenberg, Lambda Legal Defense and Education Fund, Inc., New York, New York, and Shelbi D. Day, Lambda Legal Defense and Education Fund, Inc., Los Angeles, California, for Amici Curiae Children's Law Center of California, et al.; Jay Rapaport, Covington & Burling LLP, San Francisco, California, for Amicus Curiae Dr. Jack Drescher, M.D.; Jon B. Eisenberg and Barry R. Levy, Encino, California, for Amicus Curiae First Amendment Scholars; Eileen R. Ridley, Thomas F. Carlucci, Patrick T. Wong, and Kristy K. Marino, Foley & Lardner LLP, San Francisco, California, for Amicus Curiae Health Law Scholars; Adam L. Gray and James Maxwell Cooper, Kirkland & Ellis LLP, San Francisco, California, for Amici Curiae Medical Professionals Tonya Chaffee, MD, MPH, et al.; Tara M. Steeley, Deputy City Attorney, and Dennis J. Herrera, City Attorney, and Therese Stewart, Mollie Lee, and Sara Eisenberg, Deputy City Attorneys, San Francisco, California, for Amicus Curiae The City and County of San Francisco; and Sanford Jay Rosen, Rosen Bien

Galvan & Grunfeld LLP, San Francisco, California, for Amicus Curiae Survivors of Sexual Orientation Change Efforts.

No. 13-15023

Alexandra Robert Gordon (argued), Deputy Attorney General, Kamala D. Harris, Attorney General of California, Douglas J. Woods, Senior Assistant Attorney General, Tamar Pachter, Supervising Deputy Attorney General, and Daniel J. Powell and Rei R. Onishi, Deputy Attorneys General, and Craig J. Konnoth, Deputy Solicitor General, San Francisco, California, for Defendants-Appellants Edmund G. Brown, Jr., et al.

Kevin T. Snider (argued), Matthew B. McReynolds, and Michael J. Peffer, Pacific Justice Institute, Sacramento, California, for Plaintiffs-Appellees Donald Welch et al.

Elizabeth O. Gill, ACLU Foundation of Northern California, Inc., San Francisco, California, for Amicus Curiae American Civil Liberties Union Foundation of Northern California; Peter D. Lepiscopo, William P. Morrow, James M. Griffiths, and Michael W. Healy, Lepiscopo & Associates Law Firm, San Diego, California, for Amicus Curiae American College of Pediatricians; Eric Alan Isaacson, San Diego, California, and Stacey M. Kaplan, San Francisco, California, for Amici Curiae California Faith for Equality, et al.; Brad W. Seiling and Benjamin G. Shatz, Manatt, Phelps & Phillips, LLP, Los Angeles, California, and Hayley Gorenberg, Lambda Legal Defense and Education Fund, Inc, New York, New York, and Shelbi D. Day, Lambda Legal Defense and Education Fund, Inc., Los Angeles, California, for Amici Curiae Children's Law Center of California, et al.; Shannon P. Minter, National

Center for Lesbian Rights, San Francisco, California, and David C. Dinielli, Munger, Tolles & Olson LLP, Los Angeles, California, for Amicus Curiae Equality California; Jon B. Eisenberg and Barry R. Levy, Encino, California, for Amicus Curiae First Amendment Scholars; John A. Eidsmoe and Joshua M. Pendergrass, Foundation for Moral Law, Montgomery, Alabama, for Amicus Curiae Foundation for Moral Law; Eileen R. Ridley, Thomas F. Carlucci, Patrick T. Wong, and Kristy K. Marino, Foley & Lardner LLP, San Francisco, California, for Amicus Curiae Health Law Scholars; Dean R. Broyles, The National Center for Law & Policy, Escondido, California, for Amicus Curiae Parents and Friends of Ex-Gays & Gays; and Sanford Jay Rosen, Rosen Bien Galvan & Grunfeld LLP, San Francisco, California, for Amicus Curiae Survivors of Sexual Orientation Change Efforts.

---

## OPINION

GRABER, Circuit Judge:

The California legislature enacted Senate Bill 1172 to ban state-licensed mental health providers from engaging in "sexual orientation change efforts" ("SOCE") with patients under 18 years of age. Two groups of plaintiffs sought to enjoin enforcement of the law, arguing that SB 1172 violates the First Amendment and infringes on several other constitutional rights.

In *Welch v. Brown*, No. 13-15023, the district court ruled that Plaintiffs were likely to succeed on the merits of their First Amendment claim and that the balance of the other preliminary-injunction factors tipped in their favor; thus, the

court granted a preliminary injunction. In *Pickup v. Brown*, No. 12-17681, the district court ruled that Plaintiffs were unlikely to succeed on the merits of any of their claims and denied preliminary relief. The losing parties timely appealed. We address both appeals in this opinion.

Although we generally review for abuse of discretion a district court's decision to grant or deny a preliminary injunction, we may undertake plenary review of the issues if a district court's ruling "'rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance.'" *Gorbach v. Reno*, 219 F.3d 1087, 1091 (9th Cir. 2000) (en banc) (quoting *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 755–57 (1986)). Because those conditions are met here, we undertake plenary review and hold that SB 1172, as a regulation of professional conduct, does not violate the free speech rights of SOCE practitioners or minor patients, is neither vague nor overbroad, and does not violate parents' fundamental rights. Accordingly, we reverse the order granting preliminary relief in *Welch* and affirm the denial of preliminary relief in *Pickup*.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Sexual Orientation Change Efforts ("SOCE")*

SOCE, sometimes called reparative or conversion therapy, began at a time when the medical and psychological community considered homosexuality an illness. SOCE encompasses a variety of methods, including both aversive and non-aversive treatments, that share the goal of changing an individual's sexual orientation from homosexual to heterosexual. In the past, aversive treatments included

inducing nausea, vomiting, or paralysis; providing electric shocks; or having an individual snap an elastic band around the wrist when aroused by same-sex erotic images or thoughts.  Even more drastic methods, such as castration, have been used.  Today, some non-aversive treatments use assertiveness and affection training with physical and social reinforcement to increase other-sex sexual behaviors.  Other non-aversive treatments attempt "to change gay men's and lesbians' thought patterns by reframing desires, redirecting thoughts, or using hypnosis, with the goal of changing sexual arousal, behavior, and orientation."  American Psychological Association, *Appropriate Therapeutic Responses to Sexual Orientation* 22 (2009).  The plaintiff mental health providers in these cases use only non-aversive treatments.

In 1973, homosexuality was removed from the Diagnostic and Statistical Manual of Mental Disorders.  Shortly thereafter the American Psychological Association declared that homosexuality is not an illness.  Other major mental health associations followed suit.  Subsequently, many mental health providers began questioning and rejecting the efficacy and appropriateness of SOCE therapy.  Currently, mainstream mental health professional associations support affirmative therapeutic approaches to sexual orientation that focus on coping with the effects of stress and stigma.  But a small number of mental health providers continue to practice, and advocate for, SOCE therapy.

B. *Senate Bill 1172*

Senate Bill 1172 defines SOCE as "any practices by mental health providers[1] that seek to change an individual's sexual orientation[,] . . . includ[ing] efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex." Cal. Bus. & Prof. Code § 865(b)(1). SOCE, however,

> does not include psychotherapies that: (A) provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices; and (B) do not seek to change sexual orientation.

---

[1] California Business and Professions Code section 865(a) defines "mental health provider" as

> a physician and surgeon specializing in the practice of psychiatry, a psychologist, a psychological assistant, intern, or trainee, a licensed marriage and family therapist, a registered marriage and family therapist, intern, or trainee, a licensed educational psychologist, a credentialed school psychologist, a licensed clinical social worker, an associate clinical social worker, a licensed professional clinical counselor, a registered clinical counselor, intern, or trainee, or any other person designated as a mental health professional under California law or regulation.

*Id.* § 865(b)(2). A licensed mental health provider's use of SOCE on a patient under 18 years of age is "considered unprofessional conduct," which will subject that provider to "discipline by the licensing entity for that mental health provider." *Id.* § 865.2.

Importantly, SB 1172 does *not* do any of the following:

- Prevent mental health providers from communicating with the public about SOCE

- Prevent mental health providers from expressing their views to patients, whether children or adults, about SOCE, homosexuality, or any other topic

- Prevent mental health providers from recommending SOCE to patients, whether children or adults

- Prevent mental health providers from administering SOCE to any person who is 18 years of age or older

- Prevent mental health providers from referring minors to unlicensed counselors, such as religious leaders

- Prevent unlicensed providers, such as religious leaders, from administering SOCE to children or adults

- Prevent minors from seeking SOCE from mental health providers in other states

Instead, SB 1172 does just one thing: it requires licensed mental health providers in California who wish to engage in "practices . . . that seek to change a [minor's] sexual

orientation" either to wait until the minor turns 18 or be subject to professional discipline. Thus, SB 1172 regulates the provision of medical treatment, but leaves mental health providers free to discuss or recommend treatment and to express their views on any topic.

The legislature's stated purpose in enacting SB 1172 was to "protect[] the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth, and [to] protect[] its minors against exposure to serious harms caused by sexual orientation change efforts." 2012 Cal. Legis. Serv. ch. 835, § 1(n). The legislature relied on the well documented, prevailing opinion of the medical and psychological community that SOCE has not been shown to be effective and that it creates a potential risk of serious harm to those who experience it. Specifically, the legislature relied on position statements, articles, and reports published by the following organizations: the American Psychological Association, the American Psychiatric Association, the American School Counselor Association, the American Academy of Pediatrics, the American Medical Association, the National Association of Social Workers, the American Counseling Association, the American Psychoanalytic Association, the American Academy of Child and Adolescent Psychiatry, and the Pan American Health Organization.

In particular, the legislature relied on a report created by a Task Force of the American Psychological Association. That report resulted from a systematic review of the scientific literature on SOCE. Methodological problems with some of the reviewed studies limited the conclusions that the Task Force could draw. Nevertheless, the report concluded that SOCE practitioners have not demonstrated the efficacy of

SOCE and that anecdotal reports of harm raise serious concerns about the safety of SOCE.

## C. *Procedural History*

Plaintiffs in *Welch* include two SOCE practitioners and an aspiring SOCE practitioner. Plaintiffs in *Pickup* include SOCE practitioners, organizations that advocate SOCE, children undergoing SOCE, and their parents. All sought a declaratory judgment that SB 1172 is unconstitutional and asked for injunctive relief to prohibit enforcement of the law.[2]

In *Welch*, Plaintiffs moved for preliminary injunctive relief, arguing that SB 1172 violates their free speech and privacy rights. They also argued that the law violates the religion clauses and is unconstitutionally vague and overbroad under the First Amendment.

The *Welch* court held that SB 1172 is subject to strict scrutiny because it would restrict the content of speech and suppress the expression of particular viewpoints. It reasoned that the fact that the law is a professional regulation does not change the level of scrutiny. The court granted preliminary relief because it determined that the state was unlikely to satisfy strict scrutiny, Plaintiffs would suffer irreparable harm

---

[2] In *Pickup*, Equality California, an advocacy group for gay rights, sought and received intervenor status to defend SB 1172. *Pickup* Plaintiffs argue that the Supreme Court's recent decision in *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013), means that Equality California does not have standing to defend the statute. We need not resolve that question, however, because the State of California undoubtedly has standing to defend its statute, and "the presence in a suit of even one party with standing suffices to make a claim justiciable." *Brown v. City of Los Angeles*, 521 F.3d 1238, 1240 n.1 (9th Cir. 2008) (per curiam).

in the absence of an injunction, the balance of the equities tipped in their favor, and the injunction was in the public interest. Because the district court granted relief on their free speech claim, it did not reach Plaintiffs' other constitutional challenges.[3]

In *Pickup*, Plaintiffs moved for preliminary injunctive relief, arguing that SB 1172 violates the First and Fourteenth Amendments by infringing on SOCE practitioners' right to free speech, minors' right to receive information, and parents' right to direct the upbringing of their children. They also argued that SB 1172 is unconstitutionally vague.

The *Pickup* court denied Plaintiffs' motion because it determined that they were unlikely to prevail on the merits of any of their claims. It reasoned that, because the plain text of SB 1172 bars only treatment, but not discussions about treatment, the law regulates primarily conduct rather than speech. Applying the rational basis test, the court ruled that

---

[3] The *Welch* Plaintiffs' response brief contains a single paragraph asserting that SB 1172 violates the religion clauses of the First Amendment. That paragraph, which cites neither the record nor any case, is part of Plaintiffs' argument that SB 1172 is not narrowly tailored to achieve a compelling government purpose, as required by the Free Speech Clause, because it contains no clergy exemption. The religion claim, however, is not "specifically and distinctly argued," as ordinarily required for us to consider an issue on appeal. *Thompson v. Runnels*, 705 F.3d 1089, 1099–1100 (9th Cir. 2013) (internal quotation marks omitted), *petition for cert. filed*, __ U.S.L.W. __ (U.S. June 28, 2013) (No. 13-5127); *see also Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived."). Moreover, although the *Welch* Plaintiffs raised the claim in the district court, the court did not rule on it because it granted relief on their free speech claim. In these circumstances, we decline to address the religion claim. The district court may do so in the first instance.

Plaintiffs were unlikely to show a violation of the SOCE practitioners' free speech rights or the minors' right to receive information. As for vagueness, the court ruled that the text of the statute is clear enough to put mental health providers on notice of what is prohibited. Finally, the court ruled that SB 1172 does not implicate parents' right to control the upbringing of their children because that right does not encompass the right to choose a specific mental health treatment that the state has reasonably deemed harmful to minors.

## DISCUSSION

A. *Free Speech Rights*

At the outset, we must decide whether the First Amendment requires heightened scrutiny of SB 1172. As explained below, we hold that it does not.

The first step in our analysis is to determine whether SB 1172 is a regulation of conduct or speech. Two of our cases guide our decision: *National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043 (9th Cir. 2000) ("*NAAP*"), and *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002).

In *NAAP*, 228 F.3d at 1053, psychoanalysts who were not licensed in California brought a First Amendment challenge to California's licensing scheme for mental health providers. The licensing scheme required that persons who provide psychological services to the public for a fee obtain a license, which in turn required particular educational and experiential credentials. *Id.* at 1047. The plaintiffs alleged that the licensing scheme violated their First Amendment right to

freedom of speech because the license examination tested only certain psychological theories and required certain training; plaintiffs had studied and trained under different psychoanalytic theories. *Id.* at 1055. We were equivocal about whether, and to what extent, the licensing scheme in *NAAP* implicated any free speech concerns. *Id.* at 1053 ("We conclude that, *even if* a speech interest is implicated, California's licensing scheme passes First Amendment scrutiny." (emphasis added)); *id.* at 1056 ("Although some speech interest *may be* implicated, California's content-neutral mental health licensing scheme is a valid exercise of its police power . . . ." (emphasis added)). We reasoned that prohibitions of conduct have "'never been deemed an abridgement of freedom of speech . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language.'" *See id.* at 1053 (ellipsis in original) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). And, importantly, we specifically rejected the argument that "because psychoanalysis is the 'talking cure,' it deserves special First Amendment protection because it is 'pure speech.'" *Id.* at 1054. We reasoned: "[T]he key component of psychoanalysis is the treatment of emotional suffering and depression, *not* speech. That psychoanalysts employ speech to treat their clients does not entitle them, or their profession, to special First Amendment protection." *Id.* (internal quotation marks and ellipsis omitted).

Nevertheless, we concluded that the "communication that occurs during psychoanalysis is entitled to constitutional protection, but it is not immune from regulation." *Id.* But we neither decided how *much* protection that communication should receive nor considered whether the level of protection might vary depending on the function of the communication. Given California's strong interest in regulating mental health,

we held that the licensing scheme at issue in *NAAP* was a valid exercise of its police power. *Id.* at 1054–55.

We went on to conclude that, even if the licensing scheme in *NAAP* regulated speech, it did not trigger strict scrutiny because it was both content neutral and viewpoint neutral. *Id.* at 1055. We reasoned that the licensing laws did not "dictate what can be said between psychologists and patients during treatment." *Id.* Further, we observed that those laws were "not adopted because of any disagreement with psychoanalytical theories" but for "the important purpose of protecting public health, safety, and welfare." *Id.* at 1056 (internal quotation marks omitted). We again concluded that the laws were a valid exercise of California's police power. *Id.*

In *Conant*, 309 F.3d at 633–34, we affirmed a district court's order granting a permanent injunction that prevented the federal government from revoking a doctor's DEA registration or initiating an investigation if he or she recommended medical marijuana. The federal government had adopted a policy that a doctor's "recommendation" of marijuana would lead to revocation of his or her license. *Id.* at 632. But the government was "unable to articulate exactly what speech [the policy] proscribed, describing it only in terms of speech the patient believes to be a recommendation of marijuana." *Id.* at 639. Nevertheless, the demarcation between conduct and speech in *Conant* was clear. The policy prohibited doctors from *prescribing* or *distributing* marijuana, and neither we nor the parties disputed the government's authority to prohibit doctors from *treating* patients with marijuana. *Id.* at 632, 635–36. Further, the parties agreed that "revocation of a license was not authorized where a

doctor *merely discussed* the pros and cons of marijuana use."
*Id.* at 634 (emphasis added).

We ruled that the policy against merely "recommending" marijuana was both content- and viewpoint-based. *Id.* at 637. It was content-based because it covered only doctor-patient speech "that include[d] discussions of the medical use of marijuana," and it was viewpoint-based because it "condemn[ed] expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient." *Id.* We held that the policy did not withstand heightened First Amendment scrutiny because it lacked "the requisite narrow specificity" and left "doctors and patients no security for free discussion." *Id.* at 639 (internal quotation marks omitted).

We distill the following relevant principles from *NAAP* and *Conant*: (1) doctor-patient communications *about* medical treatment receive substantial First Amendment protection, but the government has more leeway to regulate the conduct necessary to administering treatment itself; (2) psychotherapists are not entitled to special First Amendment protection merely because the mechanism used to deliver mental health treatment is the spoken word; and (3) nevertheless, communication that occurs during psychotherapy does receive *some* constitutional protection, but it is not immune from regulation.

Because those principles, standing alone, do not tell us whether or how the First Amendment applies to the regulation of specific mental health treatments, we must go on to consider more generally the First Amendment rights of professionals, such as doctors and mental health providers. In determining whether SB 1172 is a regulation of speech or

conduct, we find it helpful to view this issue along a continuum.

At one end of the continuum, where a professional is engaged in a public dialogue, First Amendment protection is at its greatest. Thus, for example, a doctor who publicly advocates a treatment that the medical establishment considers outside the mainstream, or even dangerous, is entitled to robust protection under the First Amendment—just as any person is—even though the state has the power to regulate medicine. *See Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring) ("Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment's command that 'Congress shall make no law . . . abridging the freedom of speech, or of the press.'"); Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. 939, 949 (2007) ("When a physician speaks to the public, his opinions cannot be censored and suppressed, even if they are at odds with preponderant opinion within the medical establishment."); *cf. Bailey v. Huggins Diagnostic & Rehab. Ctr., Inc.*, 952 P.2d 768, 773 (Colo. Ct. App. 1997) (holding that the First Amendment does not permit a court to hold a dentist liable for statements published in a book or made during a news program, even when those statements are contrary to the opinion of the medical establishment). That principle makes sense because communicating to the *public* on matters of *public concern* lies

at the core of First Amendment values. *See, e.g.*, *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection." (internal quotation markets, brackets, and ellipsis omitted)).  Thus, outside the doctor-patient relationship, doctors are constitutionally equivalent to soapbox orators and pamphleteers, and their speech receives robust protection under the First Amendment.

At the midpoint of the continuum, within the confines of a professional relationship, First Amendment protection of a professional's speech is somewhat diminished.  For example, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992), the plurality upheld a requirement that doctors disclose truthful, nonmisleading information to patients about certain risks of abortion:

> All that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State.  To be sure, the physician's First Amendment rights not to speak are implicated, but only as part of the practice of medicine, *subject to reasonable licensing and regulation by the State*.  We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.[4]

---

[4] Although the plurality opinion garnered only three votes, four additional justices would have upheld the challenged law in its entirety. *Casey*, 505 U.S. at 944 (Rehnquist, C.J., concurring in the judgment in

(Citations omitted; emphasis added.)    Outside the professional relationship, such a requirement would almost certainly be considered impermissible compelled speech. *Cf. Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (holding that a state could not require a person to display the state motto on his or her license plate).

Moreover, doctors are routinely held liable for giving negligent medical advice to their patients, without serious suggestion that the First Amendment protects their right to give advice that is not consistent with the accepted standard of care.  A doctor "may not counsel a patient to rely on quack medicine.   The First Amendment would not prohibit the doctor's loss of license for doing so."  *Conant v. McCaffrey*, No. C 97-00139 WHA, 2000 WL 1281174, at \*13 (N.D. Cal. Sept. 7, 2000) (order) (unpublished); *see also Shea v. Bd. of Med. Exam'rs*, 146 Cal. Rptr. 653, 662 (Ct. App. 1978) ("The state's obligation and power to protect its citizens by regulation of the professional conduct of its health practitioners is well settled. . . .  [T]he First Amendment . . . does not insulate the verbal charlatan from responsibility for his conduct; nor does it impede the State in the proper exercise of its regulatory functions." (citations omitted)); *cf.* Post, 2007 U. Ill. L. Rev. at 949 ("[W]hen a physician speaks to a patient in the course of medical treatment, his opinions are normally regulated on the theory that they are inseparable from the practice of medicine.").   And a lawyer may be disciplined for divulging confidences of his client, even though such disclosure is pure speech.  *See, e.g.*, *In re Isaacson*, State Bar Court of California, Case No. 08-O-10684, 2012 WL 6589666, at \*4–5 (Dec. 6, 2012)

part and dissenting in part).  Thus, there were seven votes to uphold the disclosure requirement.

(unpublished) (noting prior suspension of bar license for failure to preserve client confidences). Thus, the First Amendment tolerates a substantial amount of speech regulation within the professional-client relationship that it would not tolerate outside of it. And that toleration makes sense: When professionals, by means of their state-issued licenses, form relationships with clients, the purpose of those relationships is to advance the welfare of the clients, rather than to contribute to public debate. *Cf. Lowe*, 472 U.S. at 232 (White, J., concurring) ("One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession.").

At the other end of the continuum, and where we conclude that SB 1172 lands, is the regulation of professional *conduct*, where the state's power is great, even though such regulation may have an incidental effect on speech. *See id.* ("Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional's speech is incidental to the conduct of the profession."). Most, if not all, medical treatment requires speech, but that fact does not give rise to a First Amendment claim when the state bans a particular treatment. When a drug is banned, for example, a doctor who treats patients with that drug does not have a First Amendment right to speak the words necessary to provide or administer the banned drug. *Cf. Conant*, 309 F.3d at 634–35 (noting the government's authority to ban prescription of marijuana). Were it otherwise, then any prohibition of a particular medical treatment would raise First Amendment concerns because of its incidental effect on speech. Such an application of the First Amendment would restrict unduly the states' power to

regulate the medical profession and would be inconsistent with the principle that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney*, 336 U.S. at 502.

Senate Bill 1172 regulates conduct. It bans a form of medical treatment for minors; it does nothing to prevent licensed therapists from discussing the pros and cons of SOCE with their patients. Senate Bill 1172 merely prohibits licensed mental health providers from engaging in SOCE with minors. It is the limited reach of SB 1172 that distinguishes the present cases from *Conant*, in which the government's policy prohibited speech *wholly apart* from the actual provision of treatment. Under its police power, California has authority to prohibit licensed mental health providers from administering therapies that the legislature has deemed harmful and, under *Giboney*, 336 U.S. at 502, the fact that speech may be used to carry out those therapies does not turn the prohibitions of conduct into prohibitions of speech. In fact, the *Welch* Plaintiffs concede that the state has the power to ban aversive types of SOCE. And we reject the position of the *Pickup* Plaintiffs—asserted during oral argument—that even a ban on aversive types of SOCE requires heightened scrutiny because of the incidental effect on speech.[5] Here, unlike in *Conant*, 309 F.3d at 639, the law *allows* discussions about treatment, recommendations to

---

[5] We do not mean to suggest that any Plaintiff here conducts aversive SOCE therapy. The record shows that Plaintiffs who are licensed mental health providers practice SOCE only through talk therapy. We mention aversive techniques merely to highlight the state's legitimate power to regulate professional conduct.

obtain treatment, and expressions of opinions about SOCE and homosexuality.

We further conclude that the First Amendment does not prevent a state from regulating treatment even when that treatment is performed through speech alone. As we have already held in *NAAP*, talk therapy does not receive special First Amendment protection merely because it is administered through speech. 228 F.3d at 1054. That holding rested on the understanding of talk therapy as "the *treatment* of emotional suffering and depression, *not* speech." *Id.* (internal quotation marks omitted) (first emphasis added). Thus, under *NAAP*, to the extent that talk therapy implicates speech, it stands on the same First Amendment footing as other forms of medical or mental health treatment. Senate Bill 1172 is subject to deferential review just as are other regulations of the practice of medicine.

Our conclusion is consistent with *NAAP*'s statement that "communication that occurs during psychoanalysis is entitled to constitutional protection, but it is not immune from regulation." *Id.* Certainly, under *Conant*, content- or viewpoint-based regulation of communication *about* treatment must be closely scrutinized. But a regulation of only *treatment itself*—whether physical medicine or mental health treatment—implicates free speech interests only incidentally, if at all. To read *NAAP* otherwise would contradict its holding that talk therapy is not entitled to "special First Amendment protection," and it would, in fact, make talk therapy virtually "immune from regulation." *Id.*

Nor does *NAAP*'s discussion of content and viewpoint discrimination change our conclusion. There, we used both a belt and suspenders. In addition to holding that the

licensing scheme at issue was a permissible regulation of conduct, we reasoned that *even if* California's licensing requirements implicated First Amendment interests, the requirements did not discriminate on the basis of content or viewpoint. *Id.* at 1053, 1055–56. But here, SB 1172 regulates only treatment, and nothing in *NAAP* requires us to analyze a regulation of treatment in terms of content and viewpoint discrimination.[6]

Because SB 1172 regulates only treatment, while leaving mental health providers free to discuss and recommend, or recommend against, SOCE, we conclude that any effect it may have on free speech interests is merely incidental. Therefore, we hold that SB 1172 is subject to only rational basis review and must be upheld if it "bear[s] . . . a rational relationship to a legitimate state interest."[7] *Id.* at 1049.

According to the statute, SB 1172 advances California's interest in "protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual and transgender youth, and in protecting its minors against exposure to serious harms caused by sexual orientation change efforts." 2012 Cal. Legis. Serv. ch. 835, § 1(n). Without a doubt, protecting the well-being of minors is a legitimate state interest. And we need not decide whether

---

[6] We acknowledge that Plaintiffs ask us to apply strict scrutiny, but they have not cited any case in which a court has applied strict scrutiny to the regulation of a medical or mental health treatment. Nor are we aware of any.

[7] The parties dispute whether we are limited to the legislative record in assessing the constitutionality of SB 1172. We need not resolve that dispute because, whether or not we restrict our review to the legislative record, we conclude that the legislature acted rationally.

SOCE actually causes "serious harms"; it is enough that it could "reasonably be conceived to be true by the governmental decisionmaker." *NAAP*, 228 F.3d at 1050 (internal quotation marks omitted).

The record demonstrates that the legislature acted rationally when it decided to protect the well-being of minors by prohibiting mental health providers from using SOCE on persons under 18.[8] The legislature relied on the report of the Task Force of the American Psychological Association, which concluded that SOCE has not been demonstrated to be effective and that there have been anecdotal reports of harm, including depression, suicidal thoughts or actions, and substance abuse. The legislature also relied on the opinions of many other professional organizations. Each of those organizations opposed the use of SOCE, concluding, among other things, that homosexuality is not an illness and does not require treatment (American School Counselor Association), SOCE therapy can provoke guilt and anxiety (American Academy of Pediatrics), it may be harmful (National Association of Social Workers), and it may contribute to an enduring sense of stigma and self-criticism (American Psychoanalytic Association). Although the legislature also had before it some evidence that SOCE is safe and effective, the overwhelming consensus was that SOCE was harmful and ineffective. On this record, we have no trouble concluding

---

[8] We need not and do not decide whether the legislature would have acted rationally had it banned SOCE for adults. One could argue that children under the age of 18 are especially vulnerable with respect to sexual identity and that their parents' judgment may be clouded by this emotionally charged issue as well. The considerations with respect to adults may be different.

that the legislature acted rationally by relying on that consensus.

Plaintiffs argue that the legislature acted irrationally when it banned SOCE for minors because there is a lack of scientifically credible proof of harm. But, under rational basis review, "[w]e ask only whether there are plausible reasons for [the legislature's] action, and if there are, our inquiry is at an end." *Romero-Ochoa v. Holder*, 712 F.3d 1328, 1331 (9th Cir. 2013) (internal quotation marks omitted).

Therefore, we hold that SB 1172 is rationally related to the legitimate government interest of protecting the well-being of minors.[9]

B. *Expressive Association*

We also reject the *Pickup* Plaintiffs' argument that SB 1172 implicates their right to freedom of association because the First Amendment protects their "choices to enter into and maintain the intimate human relationships between counselors and clients."[10]

---

[9] The foregoing discussion relates as well to the *Pickup* Plaintiffs' claim that SB 1172 violates minors' right to receive information. *See Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1998) (recognizing the "well-established rule that the right to receive information is an inherent corollary of the rights of free speech and press").

[10] The *Pickup* Plaintiffs arguably waived their expressive association argument by not raising it in the district court. But "the rule of waiver is a discretionary one." *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1322 (9th Cir. 2012) (internal quotation marks omitted). We have discretion to

First, SB 1172 does not prevent mental health providers and clients from entering into and maintaining therapeutic relationships. It prohibits only "practices . . . that seek to change an individual's sexual orientation." Cal. Bus. & Prof. Code § 865(b)(1). Therapists are free, but not obligated, to provide therapeutic services, as long as they do not "seek to change sexual orientation."

Moreover, the therapist-client relationship is not the type of relationship that the freedom of association has been held to protect. The Supreme Court's decisions "have referred to constitutionally protected 'freedom of association' in two distinct senses." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617 (1984). The first type of protected association concerns "intimate human relationships," which are implicated in personal decisions about marriage, childbirth, raising children, cohabiting with relatives, and the like. *Id.* at 617–19. That type of freedom of association "receives protection as a fundamental element of personal liberty." *Id.* at 618. The second type protects association "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618. Plaintiffs in *Pickup* claim an infringement of only the first type of freedom of association.

---

address an argument that otherwise would be waived "when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Id.* (internal quotation marks omitted). Whether SB 1172 violates the right to expressive association is such an issue, and we exercise our discretion to address it.

Although we have not specifically addressed the therapist-client relationship in terms of freedom of association, we have explained why the therapist-client relationship is not protected by the Due Process Clause of the Fourteenth Amendment: "The relationship between a client and psychoanalyst lasts only as long as the client is willing to pay the fee. Even if analysts and clients meet regularly and clients reveal secrets and emotional thoughts to their analysts, these relationships simply do not rise to the level of a fundamental right." *NAAP*, 228 F.3d at 1050 (internal quotation marks and citation omitted). Because the type of associational protection that the *Pickup* Plaintiffs claim is rooted in "personal liberty," *U.S. Jaycees*, 468 U.S. at 618, and because we have already determined that the therapist-client relationship does not "implicate the fundamental rights associated with . . . close-knit relationships," *NAAP*, 228 F.3d at 1050, we conclude that the freedom of association also does not encompass the therapist-client relationship.

C. *Vagueness*

We next hold that SB 1172 is not void for vagueness.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Nevertheless, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). "[U]ncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (quoting *Hill v. Colorado*, 530 U.S. 703,

733 (2000)). "A defendant is deemed to have fair notice of an offense if a reasonable person of ordinary intelligence would understand that his or her conduct is prohibited by the law in question." *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1994) (internal quotation marks omitted). But, "if the statutory prohibition involves conduct of a select group of persons having specialized knowledge, and the challenged phraseology is indigenous to the idiom of that class, the standard is lowered and a court may uphold a statute which uses words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them." *Id.* (internal quotation marks omitted).

Although the *Pickup* Plaintiffs argue that they cannot ascertain where the line is between what is prohibited and what is permitted—for example, they wonder whether the mere dissemination of information about SOCE would subject them to discipline—the text of SB 1172 is clear to a reasonable person. It prohibits "mental health providers" from engaging in "practices" that "seek to change" a minor "patient['s]" sexual orientation. Cal. Bus. & Prof. Code §§ 865–865.1. A reasonable person would understand the statute to prohibit only mental health treatment, including psychotherapy, that aims to alter a minor patient's sexual orientation. Although Plaintiffs present various hypothetical situations to support their vagueness challenge, the Supreme Court has held that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Hill*, 530 U.S. at 733 (internal quotation marks omitted).

Moreover, considering that SB 1172 regulates licensed mental health providers, who constitute "a select group of persons having specialized knowledge," the standard for clarity is lower. *Weitzenhoff*, 35 F.3d at 1289. Indeed, it is hard to understand how therapists who identify themselves as SOCE practitioners can credibly argue that they do not understand what the ban on SOCE prohibits.

Neither is the term "sexual orientation" vague. Its meaning is clear enough to a reasonable person and should be even more apparent to mental health providers. In fact, several provisions in the California Code—though not SB 1172 itself—provide a simple definition: "heterosexuality, homosexuality, or bisexuality." Cal. Educ. Code §§ 212.6, 66262.7; Cal. Gov't Code § 12926®; Cal. Penal Code §§ 422.56(h), 11410(b)(7). Moreover, courts have repeatedly rejected vagueness challenges that rest on the term "sexual orientation." *E.g.*, *United States v. Jenkins*, 909 F. Supp. 2d 758, 778–79 (E.D. Ky. 2012); *Hyman v. City of Louisville*, 132 F. Supp. 2d 528, 546 (W.D. Ky. 2001), *vacated on other grounds*, 53 F. App'x 740 (6th Cir. 2002) (unpublished).

D. *Overbreadth*

We further hold that SB 1172 is not overbroad.[11]

---

[11] Intervenor Equality California argues that the *Pickup* Plaintiffs waived their overbreadth challenge by failing to raise it adequately in the district court. Although they did not argue overbreadth with specificity, they did allege it in their complaint and in their memorandum in support of preliminary injunctive relief. Moreover, whether the statute is overbroad is a question of law that "does not depend on the factual record developed below." *Ruiz*, 667 F.3d at 1322. Therefore, we exercise our discretion to address Plaintiffs' overbreadth challenge.

Overbreadth doctrine permits the facial invalidation of laws that prohibit "a substantial amount of constitutionally protected speech." *City of Houston v. Hill*, 482 U.S. 451, 466 (1987). "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Rather, "particularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

Senate Bill 1172's plainly legitimate sweep includes the prohibition of SOCE techniques such as inducing vomiting or paralysis, administering electric shocks, and performing castrations. And, as explained above, it also includes SOCE techniques carried out solely through words. As with any ban on a particular medical treatment, there may be an incidental effect on speech. Any incidental effect, however, is small in comparison with the "plainly legitimate sweep" of the ban. *Broadrick*, 413 U.S. at 615.

Thus, SB 1172 is not overbroad.

E. *Parents' Fundamental Rights*

The *Pickup* Plaintiffs also argue that SB 1172 infringes on their fundamental parental right to make important medical decisions for their children. The state does not dispute that parents have a fundamental right to raise their children as they see fit, but argues that Plaintiffs "cannot compel the State to permit licensed mental health [professionals] to engage in unsafe practices, and cannot dictate the prevailing

standard of care in California based on their own views."
Because Plaintiffs argue for an affirmative right to access
SOCE therapy from licensed mental health providers, the
precise question at issue is whether parents' fundamental
rights include the right to choose for their children a
particular type of provider for a particular medical or mental
health treatment that the state has deemed harmful. *See
Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)
(holding that courts should precisely define purported
substantive due process rights to direct and restrain
exposition of the Due Process Clause).

Parents have a constitutionally protected right to make
decisions regarding the care, custody, and control of their
children, but that right is "not without limitations." *Fields v.
Palmdale Sch. Dist.*, 427 F.3d 1197, 1204 (9th Cir. 2005).
States may require school attendance and mandatory school
uniforms, and they may impose curfew laws applicable only
to minors. *See id.* at 1204–05 (collecting cases demonstrating
the "wide variety of state actions that intrude upon the liberty
interest of parents in controlling the upbringing and education
of their children"). In the health arena, states may require the
compulsory vaccination of children (subject to some
exceptions), *see Prince v. Massachusetts*, 321 U.S. 158, 166
(1944), and states may intervene when a parent refuses
necessary medical care for a child, *see Jehovah's Witnesses
v. King Cnty. Hosp.*, 278 F. Supp. 488, 504 (W.D. Wash.
1967) (three-judge panel) (per curiam), *aff'd*, 390 U.S. 598
(1968) (per curiam). "[A] state is not without constitutional
control over parental discretion in dealing with children when
their physical or mental health is jeopardized." *Parham v.
J.R.*, 442 U.S. 584, 603 (1979).

We are unaware of any case that specifically addresses whether a parent's fundamental rights encompass the right to choose for a child a particular type of provider for a particular treatment that the state has deemed harmful, but courts that have considered whether patients have the right to choose specific treatments for *themselves* have concluded that they do not. For example, we have held that "substantive due process rights do not extend to the choice of type of treatment or of a particular health care provider." *NAAP*, 228 F.3d at 1050. Thus, we concluded that "there is no fundamental right to choose a mental health professional with specific training." *Id.* The Seventh Circuit has also held that "a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider." *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993). Moreover, courts have held that there is no substantive due process right to obtain drugs that the FDA has not approved, *Carnohan v. United States*, 616 F.2d 1120, 1122 (9th Cir. 1980) (per curiam), even when those drugs are sought by terminally ill cancer patients, *see Rutherford v. United States*, 616 F.2d 455, 457 (10th Cir. 1980) ("It is apparent in the context with which we are here concerned that the decision by the patient whether to have a treatment or not is a protected right, but his selection of a particular treatment, or at least a medication, is within the area of governmental interest in protecting public health."). Those cases cut against recognizing the right that Plaintiffs assert; it would be odd if parents had a substantive due process right to choose specific treatments for their children—treatments that reasonably have been deemed harmful by the state—but not for themselves. All the more anomalous because the Supreme Court has recognized that the state has greater power over children than over adults. *Prince*, 321 U.S. at 170 (stating that "the power

of the state to control the conduct of children reaches beyond the scope of its authority over adults").

Further, our decision in *Fields* counsels against recognizing the right that Plaintiffs assert. In that case, parents of school children argued that a school violated their parental rights when it administered to students a survey that contained several questions about sex. *Fields*, 427 F.3d at 1203. We rejected that argument, holding that, although parents have the right to inform their children about sex when and as they choose, they do not have the right to "compel public schools to follow their own idiosyncratic views as to what information the schools may dispense." *Id.* at 1206. Similarly, here, to recognize the right Plaintiffs assert would be to compel the California legislature, in shaping its regulation of mental health providers, to accept Plaintiffs' personal views of what therapy is safe and effective for minors. The aforementioned cases lead us to conclude that the fundamental rights of parents do not include the right to choose a specific type of provider for a specific medical or mental health treatment that the state has reasonably deemed harmful.

Therefore, SB 1172 does not infringe on the fundamental rights of parents.

CONCLUSION

Senate Bill 1172 survives the constitutional challenges presented here. Accordingly, the order granting preliminary relief in *Welch*, No. 13-15023, is **REVERSED**, and the order denying preliminary relief in *Pickup*, No. 12-17681, is **AFFIRMED**. We remand both cases for further proceedings consistent with this opinion.